No. 80,883

In the Matter of MICHAEL L. LEWIS, *Respondent.*

(962 P.2d 534)

Opinion filed July 10, 1998.

*Frank D. Diehl*, deputy disciplinary administrator, argued the cause and was on the formal complaints for the petitioner.

*Thomas Odell Rost*, of Rost & Rost, of Topeka, and *Michael L. Lewis*, pro se, argued the cause for the respondent.

*Per Curiam*: This is an original proceeding in discipline filed by the Disciplinary Administrator's office against Michael L. Lewis, of Topeka, an attorney admitted to the practice of law in Kansas.

The formal complaints filed against respondent consist of eight counts and allege violations of MRPC 1.1 (1997 Kan. Ct. R. Annot. 268), 1.3 (1997 Kan. Ct. R. Annot. 276), 1.4 (1997 Kan. Ct. R. Annot. 282), 1.5 (1997 Kan. Ct. R. Annot. 289), 1.15 (1997 Kan. Ct. R. Annot. 316), 1.16 (1997 Kan. Ct. R. Annot. 324), 7.3 (1997 Kan. Ct. R. Annot. 360), and 8.4(a), (c), (d), and (g) (1997 Kan. Ct. R. Annot. 366), and Supreme Court Rule 207 (1997 Kan. Ct. R. Annot. 213).

On November 13, 1997, this court issued a show cause order why respondent should not be temporarily suspended from the practice of law. Respondent appeared before this court on December 9, 1997. Respondent denied that he violated the Model Rules of Professional Conduct as alleged by the Disciplinary Administrator and indicated that he was anxious to appear before the panel and would be able to successfully respond to the charged violations. Based upon respondent's appearance and the fact that the panel hearing on the alleged violations was set for January 6, 1998, this court discharged the show cause order.

A hearing before the panel of the Kansas Board for Discipline of Attorneys was held January 6, 1998. The Disciplinary Administrator appeared by Frank D. Diehl, Deputy Disciplinary Administrator. Respondent did not appear in person or by counsel. The

panel, based on clear and convincing evidence, made the following findings and conclusions:

## "FINDINGS OF FACT

"The panel unanimously concludes there is clear and convincing evidence to establish the following findings of fact:

"1. Respondent is an attorney at law. His Kansas Registration Number is 08641. His last registration address with the Clerk of the Appellate Courts is P.O. Box 67058, Topeka, Kansas [66617]. The last known street address for the Respondent's office is 5709 SW 21st Street, Topeka, Kansas [66617].

### "[Complaint] No. A6622

"2. Betty L. Howey (now Betty Helms), complainant, and her daughter-in-law, Pamela Howey, hired the Respondent to represent them in a personal injury claim which was the result of an automobile accident which occurred May 1, 1994. The complainant at the time of the accident was approximately sixty-seven (67) years old and was a passenger in a car driven by her daughter-in-law.

"3. The complainant suffered a broken neck, broken pelvis and other injuries in the automobile accident and suffered from some type of memory loss. The complainant's medical bills exceeded $70,000.00.

"4. The Respondent visited with the complainant at her home on at least two (2) occasions and took photographs. The complainant went to the Respondent's office on four (4) or five (5) occasions without appointments but the complainant was unsuccessful in meeting with the Respondent at his office due to various excuses for his absences.

"5. The complainant's insurance carrier, Kemper Mutual, agreed to pay $4,500.00 in medical bills. The $4,500.00 check was sent to the complainant and was made out to the complainant and Stormont Vail Hospital. The Respondent took the check from the complainant during the course of one of his home visits.

"6. The $4,500.00 from Kemper Mutual was never sent to Stormont Vail Hospital. The complainant questioned the Respondent about the check and the Respondent indicated that there was nothing to worry about as the check would 'run out' and the company would renew it.

"7. The complainant and Pamela Howey then fired the Respondent due to his failure to return their phone calls, failure to keep them informed as to the status of the case, failure to respond to unannounced office visits and the manner in which he handled the check from Kemper Mutual. The complainant stopped payment on the insurance company check because the Respondent held it for so long.

"8. The complainant and her daughter-in-law then hired a new lawyer, Mr. Jack Heath, of the firm of Heath & Fisher. The complainant informed Mr. Heath that she was unable to reach the Respondent by telephone or in writing. The complainant was finally able to discharge the Respondent in March of 1995.

"9. Between March 23, 1995 and April 13, 1995, Mr. Heath called the Respondent's office and was informed that Mr. Lewis, the Respondent, was not

available. Mr. Heath left a message for the Respondent to return his phone call but no phone call was ever returned by the Respondent.

"10. On April 13, 1995, Mr. Heath mailed a certified letter to the Respondent and asked that he communicate with Mr. Heath. The letter was returned unclaimed and unopened. On June 7, 1995, Mr. Heath forwarded to the Respondent by certified mail a copy of the letter of June 7, 1995 addressed to Greg Joens [*sic*] of State Farm Insurance indicating that the Respondent had not returned his phone calls or answered letters. This June 7, 1995 letter was returned unclaimed as well. The letter was resent to the Respondent and was accepted on June 28, 1995 and signed for by Margaret K. Telthorst.

"11. Kemper Mutual then forwarded a PIP check in the amount of $400.00 payable to the complainant, the Respondent and Jack Heath. Because Mr. Heath was unable to communicate with Mr. Lewis and could not secure his signature on the check, the check was rendered non-negotiable. The check was returned to Kemper Mutual with a request to issue another check made payable to Betty L. Howey, the complainant. Kemper Mutual indicated they would only issue PIP checks to Ms. Howey and the Respondent, Michael Lewis until Mr. Lewis confirmed he was no longer representing the complainant. Kemper Mutual stated that they were also having a difficult time contacting the Respondent.

"12. Mr. Heath attempted to secure the files for the complainant from the Respondent's possession but the Respondent was never available and did not return phone messages.

"13. Mr. Heath attempted to have Kemper Mutual issue a check payable only to the complainant but Kemper forwarded two (2) additional checks made payable to the complainant and the Respondent.

"14. On April 15, 1995, Mr. Heath received a letter from Pat Mann of the Kemper Insurance Company which states that the Respondent's lack of communication caused the company great difficulty in making payment to the client, the complainant Betty L. Howey. Since the insurance company could receive no response from the Respondent, they agreed to issue the checks directly to the complainant, Betty L. Howey. A carbon copy of the letter stating this position was mailed to the Respondent.

"15. The Respondent failed to communicate with the client, Betty Howey, and to communicate with her new attorney, Mr. Jack Heath. Neither Mr. Heath nor Ms. Howey had any knowledge of outstanding medical bills since Mr. Lewis would not respond or turn over the client's files. As a result, the complainant received numerous pieces of correspondence having to do with outstanding bills. Without the information of the bills outstanding, it was not possible for Mr. Heath and Ms. Howey to submit the bills to Medicaid or Medicare for payment.

"16. The Respondent did not open a trust account until May of 1996, long after he had received the check for $4,500.00 from Kemper Insurance.

"17. John Ambrosio, a Topeka lawyer, was assigned to investigate [Complaint] No. A6622 involving the complaint of Betty Howey. The Respondent failed to cooperate with Mr. Ambrosio in that he did not promptly respond to Mr. Am-

brosio's letters and failed to promptly file a response as well as meet with the investigator.

"[Complaint] No. A6682

"18. The Respondent was hired by the complainant, Jory V. Reedy, to handle an uncontested divorce. She paid him $500.00 as his attorney's fee at their initial meeting. The Respondent met with the complainant and her spouse and prepared a Property Settlement Agreement along with a Divorce Decree. The sixty (60) day waiting period ran and the case was set for hearing. During this time Respondent did not provide the complainant with copies of documents filed with the Court or respond to her telephone calls.

"19. On May 14, 1996, the complainant called the Respondent to find out if a court date had been set. This was the third call made by the complainant and the only one which was returned. The call was returned by the Respondent's secretary. She advised Ms. Reedy her hearing date was May 23, 1996, at 8:30 a.m. before Judge Nancy [Parrish].

"20. The complainant arrived at the judge's chambers and Mr. Lewis was not present. The complainant waited approximately one hour and fifteen minutes in the hallway at the courthouse and at 9:45 a.m. called the Respondent's office. The complainant was unsuccessful in reaching the Respondent but was informed about thirty (30) minutes later that the Respondent would not be at the hearing. She was told the Respondent was out of town.

"21. Judge [Parrish] interceded on Ms. Reedy's behalf and informed the complainant that she would grant the divorce if the paperwork arrived. Judge [Parrish] then telephoned and instructed Respondent's secretary to hand deliver the paperwork to her chambers. About thirty (30) minutes later the paperwork did arrive and the divorce was granted in the absence of counsel. The complainant told Respondent's secretary that she did not hire the Respondent to be treated in that manner. The Respondent never called the complainant to apologize or to explain his lack of appearance.

"[Complaint] No. A6704

"22. The Respondent was hired by Russell Walker in Shawnee County, Case No. 94-CR-1243, to represent him in a criminal matter.

"23. A disciplinary complaint was filed by District Court Judge, the Honorable James Buchele, concerning the Respondent's failure to appear at two (2) show cause dockets. Respondent failed to appear at a hearing before Judge Buchele for order to show cause by Mr. Walker's probation officer. Judge Buchele continued the matter for two weeks so that Mr. Walker could secure Respondent's attendance. Respondent failed to appear the second time. The Respondent's client, Mr. Walker, advised the judge that he had paid the Respondent $1,000.00 to attend the hearing and that the Respondent would not return his phone calls. He stated Respondent had assured him of his attendance.

"24. Judge Buchele was never contacted by the Respondent about a continuance of the show cause hearing nor has the Respondent been in touch with the

judge concerning the failures to appear. Judge Buchele testified his office either sent out a written order or advised Respondent of the continued date of the hearing. He further testified his office had difficulty communicating with Respondent on other cases.

"25. The investigation of this case was assigned to John J. Ambrosio. Mr. Ambrosio wrote a letter to Mr. Lewis on July 16, 1996, advising the Respondent that the Respondent should call Mr. Ambrosio's secretary and set up a time for a conference. Mr. Lewis never answered this letter. On July 22, 1996, Mr. Ambrosio sent a second letter to Mr. Lewis advising that if Mr. Ambrosio could not set up an appointment by Wednesday at 5:00 p.m. that the Respondent would be reported as failing to cooperate in the investigation.

"26. The Office of Disciplinary Administrator sent out two (2) investigators to attempt to locate Mr. Lewis and he was finally located on July 31, 1996 at his office. Respondent said he would file a response with the office and contact the investigator, John Ambrosio, on August 1, 1996. The Respondent never contacted Mr. Ambrosio, the investigator.

"27. The Office of Disciplinary Administrator finally received a response from Mr. Lewis, the Respondent, on October 30, 1996.

"[Complaint] No. A6745

"28. Rosalie Crume hired Respondent to represent her in a bankruptcy action in 1994. Between 1994 and 1996, despite his promises to represent Ms. Crume, Respondent did not return her telephone calls or make himself available to meet with her. Respondent also failed to keep Ms. Crume advised of the status of her case.

[29. does not appear in the findings of fact.]

"30. Ms. Crume contacted Joe Patton, a Topeka attorney, to represent her when Respondent failed to file her bankruptcy pleadings as discussed or meet with her. Mr. Patton was unable to represent Ms. Crume because in her words, he was unable 'to sort out the mess' Mr. Lewis had created by filing a Chapter 13 Bankruptcy proceeding and failing to convert it to a Chapter 7 Bankruptcy proceeding. Ms. Crume paid Respondent a total of $1,680.00 for both bankruptcies.

"31. After Ms. Crume wrote a letter of complaint, Respondent called her to his office and voiced his displeasure with her for filing a complaint. He indicated he would file the Chapter 7 Bankruptcy for her if she would dismiss her complaint.

"32. This case was assigned to a Mr. John Ambrosio for investigation. Mr. Ambrosio sent a letter on September 13, 1996, to the Respondent asking the Respondent to call the investigator before September 19, 1996, to set up a time for an interview. The Respondent never responded to this letter nor set up a time for an interview. The certified letter which was sent on September 13, 1996 was returned unclaimed.

"33. On October 18, 1996, Mr. Ambrosio again sent a letter to the Respondent advising the Respondent that he had set up an interview on October 25, 1996, at 1:30 p.m. at Mr. Ambrosio's office. The Respondent was informed that if he did

not attend this meeting on October 25, 1996, that Mr. Ambrosio would recommend to the local committee that the Respondent had failed to cooperate. The Respondent failed to reply to the investigator by the date set and did not reply until October 30, 1996 after the investigator's report was submitted.

"[Complaint] No. A6797

"34. David Kaberline retained the Respondent on April 5, 1996, and paid the Respondent a total of $500.00 plus $61.50 for a filing fee to file a divorce action. Mr. Kaberline initially met with the Respondent on March 28, 1996, when the Respondent indicated that they should meet at a McDonald's restaurant. A Petition for Divorce was filed on April 5, 1996, and Mr. Kaberline and his wife agreed on a settlement.

"35. Mr. Kaberline, after the filing of the divorce petition, had no contact with the Respondent and was unable to find out from the Respondent why the case was not proceeding to hearing.

"36. On October 3, 1996, Mr. Kaberline wrote a letter to the Respondent setting forth the many times during the six (6) month period the Respondent never returned any of the phone calls which were left with the Respondent's secretary or on the Respondent's answering machine.

"37. The Respondent failed to show up at a court date set July 30, 1996 to conclude the divorce.

"38. David Kaberline then gave Respondent until October 18, 1996 to complete the divorce or refund the $500.00 which had been paid for the services. The Kaberline divorce was set to be dismissed on November 6, 1996 for lack of prosecution.

"39. After the complaint was filed by Mr. Kaberline, Jack Ford, an investigator with the Office of Disciplinary Administrator, contacted the Respondent and it was not until this contact that the Respondent finally concluded the Kaberline divorce.

"40. The Respondent never told Mr. Kaberline that he needed to attend a divorce workshop to conclude the divorce. Mr. Kaberline found out this information by making his own inquiries.

"[Complaint] No. A6843

"41. Gerald Davis paid the Respondent $500.00 to help him get his grandson, Fred A. Davis, II, out of the custody of SRS.

"42. Mr. Davis met Mr. Lewis, the Respondent, at a track meet and told Mr. Lewis that Davis had arranged to make an appointment with Nancy Freund to see about taking legal action against SRS.

"43. The Respondent said that he could represent Mr. Davis a lot cheaper and that he would only charge about $500.00 and Davis agreed to meet Respondent at his office on September 11, 1996. It was at that meeting that Davis paid Lewis $500.00

"44. The Respondent said that he would get right to work on the case and Davis left. After a month, Mr. Davis had heard nothing from the Respondent and began calling him almost daily, leaving his number on the Respondent's voice mail.

"45. After numerous attempt[s], the Respondent finally did call Mr. Davis and promise to start on the case the next day and to tell Mr. Davis the status at the next meeting.

"46. After this promise, Mr. Davis went to Mr. Lewis' office several times but found no one there. Davis left numerous messages that went unanswered. On October 14, 1996, Davis wrote a letter to the Respondent which was returned 'unclaimed.'

"47. Mr. Davis had to hire attorney Cathleen Downey on November 18, 1996 and pay this attorney $500.00. Ms. Downey was able to resolve the case in one (1) week on November 25, 1996.

"48. Mr. Davis sued the Respondent in Small Claims Court to attempt to recover the $500.00. Mr. Lewis subsequently returned $450.00 of the fee after he was served by the sheriff.

"49. The disciplinary case was assigned to investigator Thomas Stratton. Mr. Stratton sent a letter to the Respondent on December 24, 1996 asking for a written response to the complaint and reminding the Respondent that he had not responded to the December 4, 1996 letter from the Office of Disciplinary Administrator.

"50. On January 24, 1997, Mr. Stratton sent a follow-up letter to the Respondent reminding the Respondent that he had contacted the Respondent by letter on December 24, 1996, and by telephone message on January 7, 1997. This letter urged the Respondent to cooperate in the investigation.

"51. The Respondent left a message on January 28, 1997 for Mr. Stratton to return his telephone call. Mr. Stratton returned that call later in the day on January 28, 1997, but heard nothing further from the Respondent.

"52. Again, on February 3, 1997, Mr. Stratton left a message for the Respondent that Mr. Stratton needed to talk to the Respondent prior to the local committee meeting on February 4, 1997. This call was unanswered. The Respondent failed to cooperate in this investigation.

"[Complaint] No. A6999

"53. Michael L. Lewis was attorney of record for David Arno, petitioner, in Case No. 96-D-733 in Shawnee County, Kansas. The case is captioned *In the Matter of the Marriage of Arno*.

"54. A Petition For Divorce was filed on August 2, 1996 and a filing fee of $61.50 was paid at that time.

"55. On August 5, 1996, a summons was issued to the Respondent and was later returned, 'no service.'

"56. Because there was no service in the case, the court's Administrative Assistant, Dana Cole, called the Respondent with Mrs. Arno's address. Judge Leuenberger's Administrative Assistant left two (2) messages at the Respondent's office

informing the Respondent of the correct address for the opposing party so that the matter could proceed after proper service.

"57. On February 19, 1997, the *Arno* divorce case was continued for publication service.

"58. On May 21, 1997, Mr. Arno appeared but the Respondent failed to appear. At that hearing, Mr. Arno told the court that he had made numerous efforts to contact the Respondent but that the Respondent would not return his telephone calls.

"59. Mr. Arno also, on at least one (1) occasion, went to Respondent's office and was informed that Respondent was not there and they did not know when he would return. Mr. Arno could never reach the Respondent and the case was again continued until June 11, 1997, to give Mr. Arno an opportunity to advise the court of the status of the divorce.

"60. On May 28, 1997, Judge Leuenberger filed a complaint [with] the Office of Disciplinary Administrator. The investigation was assigned to Jack Ford. On June 2, 1997, a letter was sent from the Office of Disciplinary Administrator advising the Respondent that a complaint had been filed and docketed as [Complaint] No. A6999. The Respondent was requested to file his response within seven (7) days of the date of that letter.

"61. On September 4, 1997, investigator Ford sent a letter to the Respondent advising that he had not received his response to [Complaint] No. A6997 or A6999. On September 15, 1997, the Respondent advised that he was represented by attorneys Arthur Glassman and William Logan and that they were to file the responses. William Logan and Arthur Glassman had withdrawn from their representation of the Respondent on September 9, 1997. A copy of this notice was mailed to the Respondent at his home address. Mr. Logan states in his letter of September 18, 1997 to the Disciplinary Administrator that neither that notice nor the formal letter of withdrawal sent to the Respondent's office address was returned.

"62. Mr. Ford sent a copy of the September 18, 1997 letter to the Respondent advising the Respondent that he was no longer represented and that he should respond to the complaint. The Respondent failed to respond to Mr. Ford's letter of October 1, 1997, and failed to cooperate in the investigation.

"[Complaint] No. A6997

"63. Laura and Russell Cobb were injured in an automobile accident in August 1994. Russell Cobb suffered great bodily injury in the accident and was still in the hospital when Mrs. Cobb was given a leave from the hospital and went to Shoney's restaurant in Topeka, Kansas.

"64. At the Shoney's restaurant, Laura Cobb was approached by the Respondent and the Respondent inquired as to what was happening. Mrs. Cobb told Mr. Lewis that she had hired Dan Lykins to handle the personal injury matter resulting from the automobile accident. Respondent told Laura Cobb that she should fire Mr. Lykins since he was an ambulance chaser and that she should hire the Re-

spondent and that the Respondent would recover $1,000,000.00 for the Cobbs. He dictated letters terminating Mr. Lykins and then had Mrs. Cobb sign a contingency fee contract with him.

"65. At the time of his discharge, Mr. Lykins had been able to obtain the policy limits of the other driver's insurance company, Farm Bureau, in the amount of $100,000.00 for the claimants. He was willing to only charge the Cobbs an hourly rate fee [for a total] amount of $2,500.00 for his work on the file.

"66. Upon being hired by the Cobbs, the Respondent did nothing on the case other [than] finalize the paperwork with the insurance company to settle for the policy limits of $100,000.00. Respondent then took one-third (⅓) of the settlement amount and did nothing further.

"67. The Cobbs filed suit against the Respondent in Case No. 96-CV-256, *Cobb vs. Michael L. Lewis.* That case was assigned to Judge Marion Chipman because all of the Shawnee County judges recused themselves in the Respondent's case.

"68. During the course of the litigation the Respondent failed to respond to discovery requests or to appear for hearings and allowed a default judgment to be taken against him on March 20, 1997.

"69. A default judgment was entered against Respondent in the amount of $2,273,333.33. The court found that the Respondent had breached his fee agreement contract and found that the Cobbs were damaged in the amount of $33,333.33 since that fee was excessive when Mr. Lykins had agreed to do the work for approximately $2,500.00.

"70. Mr. Lykins testified that he was hired on a contingency basis but he knew that the policy limits of the driver who was at fault were only $100,000.00. Because of the catastrophic damage to Mr. Cobb, he agreed to take the case on an hourly basis and his fee was approximately $2,500.00 for settling for the policy limits. Mr. Lykins took the case on an hourly basis because of the injuries to Mr. Cobb and the fact that a contingency fee recovery of one-third (⅓) would have left very little for the Cobbs to recover.

"71. Mr. Lykins testified he had also contacted an expert to check the crash worthiness of the Cobb vehicle to find any possible defects which may have contributed to Mr. Cobb's injury. Mr. Lykins advised the Cobbs that he would enter into a contingency fee arrangement with them in the products case and assume the risk in that case for his fee. Mr. Lykins was also looking to other means of recovery for Mr. Cobb's loss of wages.

"72. Upon his hire, Respondent told the Cobbs to get rid of the car and said that Mr. Lykins was incompetent and there was no reason to keep the automobile. The Cobbs let the car go for storage fees. Mr. Lykins testified that the car should have been retained for the expert to check the crash worthiness of the vehicle.

"73. The Cobbs were never successful in being able to contact the Respondent although they made numerous attempts to find out what was going on with their case. The Respondent told Laura Cobb that the $100,000.00 was a drop in the bucket and that he would do further work on the personal injury case but the Respondent never did anything further. Mrs. Cobb even attempted to call the

Respondent's wife to try to locate the Respondent to gather information about the case when she could not find the Respondent.

"74. The court in 96-CV-256 found that the Respondent was negligent in handling the case and awarded damages in the amount previously stated. The court ruled that the Cobbs were damaged in the amount of $740,000.00 for medical bills; $1,000,000.00 for loss of wages; $250,000.00 for the plaintiff's pain and suffering and $250,000.00 for the plaintiff's loss of consortium. In addition, the previously mentioned sum of $33,333.33 was awarded in attorney's fees.

"75. Judge Chipman found that the Respondent's conduct in 'pirating plaintiff's case away from capable counsel and taking a full one-third (⅓) recovery when the work had been practically done by previous counsel' was reprehensible conduct and the court ordered that the transcript of the hearing be delivered to the Office of Disciplinary Administrator.

"76. The case was assigned to Jack Ford for investigation. The Respondent ignored the letters from the Office of Disciplinary Administrator and then stated that counsel was to represent him and file his response. Counsel had previously withdrawn and notice was sent to Mr. Lewis. Mr. Ford gave Lewis a deadline of October 17, 1997 for his response but the Respondent failed to respond even though he was personally served with the letter giving him the October 17, 1997 deadline. Respondent failed to cooperate with this investigation."

The panel concluded that respondent's actions violated MRPC 1.1, 1.3, 1.4, 1.5, 1.15, 1.16, 7.3, and 8.4(a), (c), (d), and (g), and Supreme Court Rule 207. The panel unanimously recommended that respondent be disbarred pursuant to Supreme Court Rule 203(a)(1) (1997 Kan. Ct. R. Annot. 201).

In making its recommendation, the panel found no mitigating circumstances. The panel found the following aggravating factors:

"1. Respondent has been informally admonished on three previous occasions for lack of competence, diligence, and improper handling of client's funds in a probate and wrongful death matter; for lack of diligence relative to his action in filing a divorce action; and for failure to provide a client with documents and failing to protect his client's interests.

"2. Respondent's actions in the present cases and his prior disciplinary proceedings evidence a continuing pattern of neglect and a continuing pattern of failure to communicate with his clients and the courts and multiple offenses.

"3. Respondent's actions in the [Complaint] Numbers A6997 and A6843 evidence dishonest and selfish motive.

"4. Respondent failed to cooperate with the various investigators assigned to investigate his complaints.

"5. Respondent failed to appear at the disciplinary hearing or file an answer to the complaints. He seemingly refuses to acknowledge the wrongful nature of his conduct.

"6. The panel is advised Respondent told the Kansas Supreme Court in proceedings before it in December of 1997 to have him temporarily suspended that 'I'm looking forward to my day before the hearing panel so that I can express my views and I expect to be exonerated.' Despite the assurances to the Supreme Court, Respondent failed to appear for the hearing. The panel believes these statements made by Respondent to the Kansas Supreme Court during the disciplinary process were false.

"7. The complainants in the above-referenced cases were vulnerable.

"8. Respondent has practiced law for 23 years and has substantial experience in the practice of law.

"9. Respondent did not refund monies to his clients in all cases. Refunds in two of the cases were not made until legal or disciplinary action had been instituted."

The panel elaborated on its reasoning in recommending disbarment:

"Testimony by the Shawnee County district judges at the hearing established the judges in Shawnee County have been extremely lenient towards Respondent concerning his repeated missed court appearances and lack of diligence on his files.

"Respondent's conduct with respect to representation of his clients in the cases before the panel is reprehensible. One after another, the complainants each described the same scenario of events of unanswered messages on answering machines and neglect over a significant time period. Respondent's conduct in attempting to sneak out the back door of his law offices to avoid his anxious clients and leaving messages posted on the door at their scheduled appointment times without meeting them cannot be condoned. Most troubling to the panel, however, is the Respondent's 'piracy' of clients from competent attorneys and his failure to adequately represent the clients after stealing them away from other counsel. His motives were selfish and for purely personal gain. These actions, together with his misrepresentations to the Kansas Supreme Court about his upcoming appearance before the panel, and his failure to appear at the hearing make it clear to the panel that the Respondent is unfit to practice law."

On January 8, 1998, based upon its findings and the failure of respondent to appear for the hearing, the Kansas Board for Discipline of Attorneys filed a motion requesting this court to compel respondent to appear before this court and show cause why he should not be temporarily suspended pending the final hearing before this court. The panel found that respondent had violated the Model Rules of Professional Conduct as charged and that he failed to appear before the panel on January 6, 1998. A second show cause order was issued. Respondent again appeared before this court on January 23, 1998, and again denied that he had vio-

lated the Model Rules. He stated that his failure to appear before the panel was due to not receiving notice of the hearing and, on that date, he was attending his aunt's funeral. On February 5, 1998, this court entered an order temporarily suspending respondent pending the final disciplinary hearing before this court.

Respondent filed exceptions to the panel report. He first claimed that he did not receive notice of the January 6 hearing before the panel. He further contended that if he had been notified, he would have appeared and refuted all charges. He prays that this court grant him a rehearing to allow him to present evidence to refute the panel's findings. He further takes issue with the panel's recommendation that he be disbarred. This court responded to his filing of exceptions to the panel report by order dated April 20, 1998, limiting oral argument before this court to whether this matter should be remanded to the panel for rehearing or, in the alternative, whether the recommended discipline should be imposed.

At oral argument, respondent reiterated that he did not receive notice of the January 6, 1998, panel hearing and that if he had been notified, he would have appeared. Respondent's argument raises an important question and one that is fundamental to the validity of the disciplinary proceedings. However, for several reasons, respondent's argument has no merit. First, the Disciplinary Administrator served respondent with notice of the hearing before the panel by both regular and certified mail. Respondent failed to claim the certified mailing, and it was returned before the January 6, 1998, panel hearing. The regular mailing was returned after the hearing and marked "return to sender." Service by mail is complete upon mailing. Supreme Court Rule 224(b) (1997 Kan. Ct. R. Annot. 253); K.S.A. 60-205(b).

Second, at the first show cause hearing on December 9, 1997, in respondent's presence, Deputy Disciplinary Administrator Frank Diehl, in his oral argument to the court, stated that the complaints against respondent were originally set for hearing in April 1997 and were continued at that time by respondent and reset for hearing before the panel on January 6, 1998. He concluded his comments to the court indicating his satisfaction that this matter would be resolved very shortly by the panel.

After a careful review of the record and oral arguments, we concur in the findings and conclusions of the hearing panel; however, a majority of the court finds that respondent should be indefinitely suspended from the practice of law and not disbarred.

IT IS THEREFORE ORDERED that Michael L. Lewis be and he is hereby disciplined by indefinite suspension for his violations of the Model Rules of Professional Conduct.

IT IS FURTHER ORDERED that Michael L. Lewis shall make full restitution to complainants prior to the filing of a petition pursuant to Rule 219 (1997 Kan. Ct. R. Annot. 245) and that he comply with Rule 218 (1997 Kan. Ct. R. Annot. 235).

IT IS FURTHER ORDERED that the costs of these proceedings be assessed to respondent and that this order be published in the official Kansas Reports.